STATE of Missouri, Respondent,

v.

Preston PLATT, Appellant.

No. KCD 26497.

Missouri Court of Appeals, Kansas City District.

June 4, 1973.

Rehearing Denied June 26, 1973.

Robert G. Duncan, Duncan & Russell, Kansas City, for appellant.

John C. Danforth, Atty. Gen., Vincent F. Igoe, Jr., Asst. Atty. Gen., Jefferson City, for respondent.

Before WASSERSTROM, P. J., and SHANGLER and SWOFFORD, JJ.

WASSERSTROM, Presiding Judge.

The amended information upon which this case went to trial alleged that defendant distributed to Deanna Sue Warren a quantity of Lysergic Acid Diethylamide (LSD). The act alleged constitutes a violation of § 195.020 RSMo 1969, V.A.M.S., and since Deanna Warren was a minor, the penalty range under § 195.200(4) was imprisonment for a term of from five years to life. Trial to a jury resulted in conviction and sentence of eighteen years.

The issues on this appeal are: (1) whether the evidence was sufficient to support the verdict; (2) whether a new trial should have been granted because of certain recanted testimony; and (3) whether the State's chemist was properly permitted to testify as to the effect of LSD on the human body.

## I

## SUFFICIENCY OF THE EVIDENCE

The elements of the offense here are: (a) distribution of the pills by defendant to Deanna Warren; (b) proof that the items so transferred contained LSD; (c) evidence that LSD is a controlled substance listed in Schedules I or II issued by the Division of Health; and (d) proof that Deanna Warren was at the time of distribution under the age of 21 years. The evidence in this case is uncontradicted that Deanna Warren did have in her possession on January 14, 1972, four pills containing LSD, that LSD is a Schedule I drug, and that Deanna Warren was at that time a minor. That left only one element in dispute, namely, whether defendant did, in fact, give these pills to Deanna. As to this, the testimony was in direct conflict. Defendant denied that he did so. Deanna, on the other hand, testified explicitly and without wavering that these pills were given to her by defendant on the evening of January 13, 1972. On this direct conflict, the jury chose to believe Deanna. If that were all that was involved, the jury verdict would conclude this issue.

However, defendant claims that Deanna's testimony was destroyed by certain self-contradictions on her part, and that her testimony, which was at sharp variance to that of defendant and his witnesses, cannot constitute substantial evidence sufficient to support conviction. Defendant stresses evidence in the record tending to prove an emotional involvement by Deanna with defendant in the latter part of 1971, and a rather intense jealous reaction when defendant began dating Deanna's friend Retha Terranova in January, 1972. Defendant points to the reluctance of Deanna to admit any of this and considerable vacillation in her testimony concerning the extent of her contact with defendant, her feelings toward him, and especially her authorship of certain letters received by Retha pertaining to those subjects. Defendant proceeds to argue that this factor colors the case with overtones of adolescent passion to an extent that appellate review here should be the same as in cases of rape, incest and related sexual crimes. Defendant then goes on to cite a line of authority holding that in cases of that character, conviction will not be sustained upon the uncorroborated testimony of the prosecutrix if her testimony is so inconsistent and contradictory that the appellate court is left shrouded in doubt.

It is true that there are many early cases in this State setting forth and applying that rule of law. See for example, State v. Tevis, 234 Mo. 276, 136 S.W. 339 (1911); State v. Donnington, 246 Mo. 343, 151 S.W. 975 (1912); State v. Brown, 209 Mo. 413, 107 S.W. 1068 (1908); State v. Goodale, 210 Mo. 275, 109 S.W. 9 (1909). The basic reasoning in those opinions was that there are generally only two witnesses to this type of alleged sexual crime, that being the accuser and the accused, and the courts were inclined to heed the admonition of Lord Hale that "It must be remembered that this is an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, though never so innocent". Those cases also make reference to the ease of blackmail in cases of that type and the frequent instances of such attempts.

The adoption of this exception to the general rules governing appellate review had its roots in special considerations applicable peculiarly to sexual crimes, and that exception should not be expanded to other types of cases. Indeed our courts have demonstrated a decided inclination to recede from this special rule even in the specific instances of rape and incest, where the exception found its origin. Although the cases relied upon by defendant continue to be cited in court opinions, they are generally quickly distinguished and passed over. On the other hand, sharp criticism of those cases are also to be found. Thus in a leading case, State v. Wade, 306 Mo. 457, 268 S.W. 52, l. c. 54-55 (1924), the previous cases were distinguished and nar-

rowly interpreted, and the rule was stated to be that the prosecutrix's testimony would be disregarded only where the facts testified to by her "were so unusual and so out of harmony with human experience that such testimony had no probative force". See also State v. Thomas, 318 Mo. 843, 1 S.W.2d 157, 1. c. 159–160 (Mo.1927); State v. Palmer, 306 S.W.2d 441, 1. c. 443 (Mo. 1957); State v. Sikes, Mo., 24 S.W.2d 989 (1930). And in State v. Barnes, 325 Mo. 545, 29 S.W.2d 156, 158, the court specifically disapproved the Goodale case and others to like effect, going on to hold:

"No sufficient reason appears why a rape case should stand on any different ground from any other case in respect to the sufficiency of the evidence to make a case for the jury. Where, as here, the prosecutrix tells a positive and unshaken story of sexual outrage, which in itself is entirely possible and not contrary to human experience, it is the exclusive province of the jury to pass upon the truth of her story. An appellate court should not usurp the proper functions of the trial court and jury and set the conviction aside merely because it may disagree with the jury as to the truthfulness of the story told by the prosecutrix, or think the trial court should have set the verdict aside as against the weight of the evidence."

■■■ On the basis of the foregoing, there is substantial doubt whether there is any different approach to be followed in the appellate review of rape and incest cases as contrasted to the review of any other kind of case; and it is even more questionable whether any special rule applicable to the review of those sexual cases should be imported into cases involving different crimes, such as the one here. Nevertheless, even if the rule contended for by defendant be accepted and applied in this case, still it must be held that the testimony of Deanna Warren, as given by her before the jury, was sufficient for submission. The only element of the offense to-

ward which any of her testimony was directly pertinent concerned the issue of whether she had received the four tablets of LSD from defendant. With respect to that fact, her testimony was unequivocal and remained unshaken. The inconsistencies which defendant points out have to do only with the length and nature of her association with the defendant, the nature of her original feelings toward the defendant and her present animus against him, and certain letters written by Deanna to her girl friend Retha Terranova, bearing on those matters. Deanna's testimony in these regards will be more fully discussed under Point II of this opinion. Suffice it to say here that although those inconsistencies and contradictions bore heavily upon the question of Deanna's credibility, nevertheless, in the final analysis credibility is for jury determination, and if the jury was willing to accept Deanna's testimony, even with the inconsistencies shown, her testimony so accepted was sufficient to sustain the verdict. So far as this phase of the case is concerned, it comes within the general rule that the testimony of a single witness, if deemed credible by the jury, may be considered sufficient for conviction, though that testimony is uncertain or inconsistent. 23 C.J.S. Criminal Law § 903, p. 540; State v. Dowe, 432 S.W.2d 272, 1. c. 274–275 (Mo.1968).

II

NEW TRIAL BECAUSE OF THE RECANTATION

During the course of the trial, defendant strove strenuously to impeach the credibility of Deanna Warren on the basis of her jealousy which arose from defendant's transfer of his attentions to Retha Terranova. Defendant's theory was that Deanna's testimony was an act of revenge on her part as "a woman scorned". In connection with this theory of defense, defense counsel first asked Deanna concerning her relationship with the defendant, and initially Deanna responded that de-

fendant was virtually a stranger to her and that she had no particular feelings toward him one way or another. In order to break through these denials, defendant's counsel then confronted Deanna with a series of six letters and Deanna was asked whether she had written these letters to her friend Retha.

At first Deanna denied the authorship of these letters. However, as the trial progressed and after certain defense testimony had been introduced including that of Retha, Deanna was recalled as a witness and her testimony began to waver and change. After first hedging by saying that she might have written some of the letters, she ultimately admitted authorship of three. Still, she continued to deny the authorship of the most important letter of all, that being defendant's Exhibit A. Finally, after a recess in which she conferred with the prosecuting attorney, Deanna went so far as to admit that she "might have" authored Exhibit A, but she continued to insist that with respect to this highly important piece of evidence she could not say that she had written it. In answer to the direct question whether or not she wrote Exhibit A her answer was, "I might have, I really don't remember."

With the evidence in this state, the case went to the jury. While the jury was out for its deliberations, a juvenile officer called the prosecuting attorney to the back of the courtroom where she proceeded to tell the prosecutor that Deanna had just admitted having written the disputed Exhibit A. Although she was in easy hearing range, Deanna did not deny the report being made by the juvenile officer but just sat there crying.

These facts were communicated by the prosecutor to defense counsel, and the latter made this one of the grounds for requesting a new trial. Thereafter, a hearing on the motion was held and counsel stipulated in open court to the facts as above set forth.

Under these facts, there can be no doubt but that Deanna Warren gave false testimony and avoided telling the truth. The facts stipulated by counsel remove all question on this score. Deanna's sitting next to the juvenile officer and listening in sobs to the story of her false testimony without any effort at protest constituted an adoption by her of that report more eloquently than if she had ratified the juvenile officer in express words.

This calls into play the principle that it becomes the duty of the trial court to grant a new trial when it is established that the verdict rests upon perjured testimony. This principle is stated in State v. Harris, 428 S.W.2d 497, 1. c. 500 (Mo. 1968), as follows:

"It would be patently unjust for a trial judge to refuse to grant a new trial in any case in which an accused was found guilty of a crime on the basis of false testimony, and the court 'if satisfied that perjury had been committed and that an improper verdict or finding was thereby occasioned,' Donati v. Gualdoni, 358 Mo. 667, 216 S.W.2d 519, 521, would be under a duty to grant a new trial. That is to say, '[w]here it appears from competent and satisfactory evidence that a witness for the prosecution has deliberately perjured himself and that without his testimony accused would not have been convicted, a new trial will be granted.' 24 C.J.S. Criminal Law § 1454, pp. 188, 189."

In Donati v. Gualdoni, 358 Mo. 667, 216 S.W.2d 519, 521 (1948) it is held:

"No verdict and resultant judgment, in any case, could be said to be just if the result of false testimony. The trial court had the duty to grant a new trial, if satisfied that perjury had been committed and that an improper verdict or finding was thereby occasioned."

To like affect see Pitzman's Company v. Bixby and Smith, 338 Mo. 1078, 93 S.W.2d 920, 922 (1936).

In an effort to escape the force of this rule, the State relies upon a long line of cases which hold that newly discovered evidence which serves only to impeach credibility is not ground for a new trial. The principle so relied upon unquestionably is the law, but it is not applicable here. The matter concerning which Deanna equivocated and withheld the truth went significantly beyond mere impeachment. The letter in question dated January 22, 1972, and sent by Deanna to Retha, stated in part as follows:

"But I want ya [sic] to do a little favor for me because if you don't after he comes home you won't be able to see him if you don't. Know what I mean. If anybody, and I mean anybody asks whether you know him or whether I know him say no. I mean it for his sake, mine and for yours. If you don't understand now just go ahead and do it and I'll explain to you later. I might be able to get him to come home if you do. If you don't, I won't be able to. And Retha, you might as well know this, I'm the only one who can do that, so if you want him home say no. * * *"

The meaning of this part of the letter is far from clear. However, one permissible interpretation of the letter is that Deanna was offering in a disguised fashion to testify to the truth and thereby see to it that defendant was freed of the charges pending against him. Whether that be the correct interpretation of the letter or not, at least defendant should have had the opportunity to cross-examine Deanna concerning this important piece of evidence and ascertain what she meant with respect to the quoted portion. That cross-examination, which was not possible unless and until Deanna admitted her authorship of the letter, might well have forced disclosure that she had lied about the defendant being her source for the four LSD tablets. This, therefore, was an exceedingly important line of inquiry going to the crux of the case.

■ Permitting this new evidence to go before the jury and permitting further cross-examination along the lines indicated above, might very well produce a different result. Such a reasonable possibility is enough to justify and require the granting of a new trial. State v. Bailey, 94 Mo. 311, 7 S.W. 425, 427 (1888); State v. Jennings, 326 Mo. 1085, 34 S.W.2d 50, 54 (1930). If the jury had been aware of Deanna's recantation concerning authorship of Exhibit A and if expanded cross-examination had become possible following that, then there would have been fully informed jury action, and its verdict then would have been binding on appeal, under the rules stated in Part I of this opinion. However, in this case, the jury was not given the chance to be fully informed. Absent a full presentation of the recantation to the jury, its verdict and 18 year sentence cannot be regarded as the result of a fair trial. The tainted informational input fatally contaminated the jury's adjudicatory output. A new trial therefore should have been granted.

### III

### ADMISSIBILITY OF THE EXPERT TESTIMONY

The State called Karen Huselton as an expert witness primarily to prove that the pills found in Deanna's possession contained LSD, and that LSD is a controlled drug listed in the Division of Health's Schedule I. After eliciting that testimony, the prosecuting attorney then proceeded to ask Huselton "how it [the drug LSD] affects folks who take it." Defendant's counsel objected as follows:

"Your Honor, I'm going to object. The person that should be, if somebody is going to testify as to effects it should be a physician to a psychiatrist or a doctor, a nurse, or the person that wrote the book. She's just relating something that she read and doesn't know whether it's true or not."

The objection was overruled, and the witness was permitted to testify that "the drug produces an effect on the central nervous system which causes a person to have hallucinations." Defendant on this appeal claims that ruling to be error, expanding its argument here to include objection on the ground of materiality as well as the objection stated at trial.

A ruling on this evidentiary point is not necessary for the disposition of the present appeal, but will be considered nevertheless, for the guidance of counsel and the trial court in connection with retrial. The objection made at trial, that the witness was not qualified to answer the question as an expert witness, is without merit. A qualified chemist, particularly one trained in toxicology, is competent to testify as to the effect of drugs upon the human body. Dickey v. Western Tablet Co., 218 Mo.App. 253, 267 S.W. 431, 434 (1924); "Qualifications of chemist or chemical engineer to testify as to effect of poison upon human body", 70 A.L.R.2d 1029.

However, upon retrial this question should not be asked. Although defendant did not make proper objection at the time of the original trial on the ground of lack of materiality, the argument now made on appeal on that ground is sound. Martinez v. State, 138 Tex.Cr.R. 51, 134 S.W.2d 276; Guajardo v. State, 378 S.W.2d 853, (Tex.Cr.App.1964). The effect of this evidence was clearly prejudicial. The admission of this evidence permitted an argument be made on that subject to the jury and may very well have accounted at least in part for the extremely heavy sentence of eighteen years imprisonment which was returned by the jury.

The conviction is reversed and cause remanded for new trial.

All concur.